# IN THE SUPREME COURT OF IOWA

No. 11–0570

Filed February 1, 2013

**DALE BOELMAN** and **NANCY BOELMAN,**

Appellees,

vs.

**GRINNELL MUTUAL REINSURANCE COMPANY,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Butler County, Stephen P. Carroll, Judge.

An insurance company seeks further review of a court of appeals opinion affirming the district court decision in favor of the insureds. **COURT OF APPEALS DECISION VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED WITH INSTRUCTIONS.**

Douglas A. Haag of Patterson Law Firm, L.L.P., Des Moines, for appellant.

Bruce J. Toenjes of Nelson & Toenjes, Shell Rock, for appellees.

Eldon L. McAfee and Erin C. Herbold of Beving, Swanson & Forrest, P.C., Des Moines, for amicus curiae Iowa Pork Producers Association.

**WIGGINS, Justice.**

This appeal involves the question of whether an insurance policy provides coverage to a custom farming operation. Both parties filed motions for summary judgment. The district court overruled the insurance company's motion for summary judgment. The district court granted the insureds' motion for summary judgment and entered judgment for the insureds based on the reasonable expectations doctrine. The court of appeals affirmed the district court's judgment on alternative grounds, concluding the insurance policy was ambiguous and construing the ambiguity in favor of the insureds to find coverage. On further review, we conclude the policy is not ambiguous, and as a matter of law, the policy does not provide coverage. Additionally, we find there is no genuine issue of material fact as to the application of the reasonable expectations doctrine, and as a matter of law, the doctrine does not apply. Therefore, we vacate the decision of the court of appeals, reverse the judgment of the district court, and remand the case to the district court with instructions to enter judgment in favor of the insurance company on its motion for summary judgment.

### I. Background Facts and Proceedings.

The facts giving rise to this action are not in dispute. Dale and Nancy Boelman are farmers in Butler County. Their farming operation involves contract-feeding nursery hogs for others until the hogs are fattened and ready for market. Under one such arrangement, the Boelmans agreed to raise hogs owned by Budke Farms. A contractor, Schneider's Milling, Inc., organized the arrangement. A "Sew Nursery Agreement" defined the Boelman's obligations.

Pursuant to that agreement, the Boelmans fed, cared for, and managed the hogs supplied to them. They also were required to furnish

all insurance on the building and hogs, specifically for suffocation of the animals. Meanwhile, Schneider's Milling provided the feeder hogs, oversaw the farm's management, paid for feed and medications, and compensated Dale for his efforts at $81,600 per year.

On October 4, 2008, the Boelmans had approximately 1254 nursery hogs on their farm. Of those, 535 hogs suffocated to death in the Boelmans' building. The deaths occurred when Dale was cleaning out the manure basins. It is undisputed that the hogs were in the exclusive care, custody, or control of the Boelmans at that time. The Boelmans were required to exercise such control over the hogs pursuant to the "Sew Nursery Agreement."

**A. The Farm-Guard Policy.** Approximately two years prior to the hog loss, on or about August 1, 2006, the Boelmans purchased a Farm-Guard policy from the First Maxfield Mutual Insurance Association (First Maxfield). Grinnell Mutual Reinsurance Company (Grinnell Mutual) reinsured the policy. Dale and Nancy Boelman are the named insureds. It is undisputed that the policy was in effect when the hog casualties occurred in October 2008.

Subsequent to the hog loss, the Boelmans filed a claim with Grinnell Mutual to recover under their Farm-Guard policy. Grinnell Mutual denied the claim. The Boelmans borrowed funds and compensated Budke Farms for the casualty expenses totaling $24,075. The Boelmans then sued First Maxfield and Grinnell Mutual for breach of contract.

The Farm-Guard policy provides protection for property damage. It does so through five different types of coverage. This appeal concerns the Boelmans' liability to the public for property damage under Coverage A and liability for damage to other's property pursuant to Coverage A-1.

Both Coverage A and A-1 adopt the same definition of property damage. The definition of property damage used throughout the policy is as follows:

> 15. "Property damage" means the physical injury to or destruction of tangible property. "Property damage" does not include loss of use unless the property has been physically injured or destroyed.

Under Coverage A, which protects the insured against liability to the public, the insurance company will pay up to the policy limits for "any one loss which any 'insured person' becomes legally obligated to pay as damages because of . . . 'property damage' covered by this policy." Grinnell Mutual covers $100,000 per loss occurrence, with a $200,000 annual aggregate. The policy, however, precludes recovery under Coverage A in the following circumstance:

> 5. "We" do not cover "property damage" to property rented to, leased to, occupied by, used by, or in the *care, custody or control* of any "insured person" or any persons living in the household of an "insured person" . . . .

(Emphasis added.)

Coverage A-1 protects the insured from "any one loss for 'property damage' to property owned by others in the care of any 'insured person.'" Grinnell Mutual compensates the insured for a loss at $1000 per occurrence. However, the following exclusion specifically applies to Coverage A-1:

> 2. "We" will not pay for "property damage" arising out of "*custom farming.*"

(Emphasis added.) The policy defines custom farming as: "any activity arising out of or connected with . . . [the] care or raising of 'livestock' . . . by any 'insured person' for any other person or organization in

accordance with a written or oral agreement." The policy states livestock includes hogs.

In addition to these coverage-specific exclusions, the Farm-Guard policy also includes general exclusions that are applicable "UNDER ANY OF THE COVERAGES." Among those are two relevant provisions: one excluding recovery for property damage arising from the care, custody, or control of another's property and one for custom farming. The provisions are as follows:

> 5. "We" do not cover "bodily injury" or "property damage" arising out of any premises:
>
> . . . .
>
> d. in the *care, custody or control* of any "insured person"; which is not an "insured premises". . . .
>
> 6. "We" do not cover "bodily injury" or "property damage" arising out of:
>
> a. *"custom farming" operations of any "insured person"* if the "total gross receipts" from all "custom farming" exceed $2000 in the twelve months of the prior calendar year. . . .

(Emphasis added.)

**B. Custom Feeding Endorsement.** The parties modified the basic Farm-Guard policy through several endorsements. Pertinent to this dispute is the Custom Feeding Endorsement. It is clear the parties intended and understood the endorsement changed the coverage under the policy. The endorsement's caption states in bold and capital letters, surrounded by a box border: "**PLEASE READ THIS ENDORSEMENT CAREFULLY, AS IT MODIFIES THE POLICY.**"

The endorsement operates to *modify* the general exclusion under section 6(a) regarding custom farming. The endorsement provides:

EXCLUSIONS

UNDER ANY OF THE COVERAGES

. . . .

In consideration of the premium charged, exclusion 6.a. under this section of the policy does not apply if:

1) the "bodily injury" or "property damage" arises from the activities of care or raising of "livestock" or "poultry" by any "insured person" for *any other person* or organization in accordance *with a written or oral agreement*; and

2) your "total gross receipts" for the prior calendar year from the activities described in paragraph 1) do not exceed the amount of gross receipts as stated on "your" declaration page or are:

> (Please check box that applies)

> ☒ not more than $150,000

(Emphasis added.)

**C. Proceedings.** Following denial of their claim, the Boelmans filed their petition for breach of contract against First Maxfield under the Farm-Guard policy. The Boelmans amended their petition to include Grinnell Mutual as a defendant. In their petition, the Boelmans sought damages in the amount of $24,075 plus actual interest at 7.5% and litigation costs.

Grinnell Mutual answered and counterclaimed, seeking a declaratory judgment that the Farm-Guard policy does not cover the Boelmans' claim. Specifically, Grinnell Mutual alleged Coverage A, which protects against liabilities to the public, does not apply because the property damage occurred while the hogs were in the Boelmans' care, custody, or control. Grinnell Mutual refers to the specific care, custody, or control exclusion under Coverage A. Second, they denied the claim pursuant to Coverage A-1 (damage to property of others), citing Exclusion 2 pertaining to custom farming.

The Boelmans subsequently dismissed their claim against First Maxfield without prejudice. Both Grinnell Mutual and the Boelmans then filed cross motions for summary judgment. Grinnell Mutual asserted there was no genuine issue as to any material fact and that as a matter of law, the hog loss was not covered under the policy. The Boelmans countered that the endorsement insured the loss.

The district court granted the Boelmans' motion for summary judgment. The district court employed the reasonable expectations doctrine to conclude the Boelmans reasonably expected the endorsement to protect all activities in their custom farming operation, not just those specifically arising under the custom farming exception in general exclusion 6(a). Accordingly, the district court held the Boelmans could recover, despite the care, custody, or control exclusion. Moreover, the district court held denying coverage would thwart the insurance transaction's purpose of protecting custom farming through the endorsement.

Grinnell Mutual appealed. The court of appeals affirmed the district court ruling. The court of appeals found the policy was ambiguous based on the two interpretations proffered by the parties and did not conduct an analysis under the reasonable expectations doctrine. The court of appeals construed the ambiguity in favor of the Boelmans.

Grinnell Mutual subsequently sought further review, which we granted.

Other facts relevant to our analysis are included below.

**II. Issues.**

The first issue raised on appeal requires us to decide if there is a genuine issue of material fact as to whether the Farm-Guard policy with the Custom Feeding Endorsement, as written, covers the Boelmans' loss.

If not, we then must decide whether a genuine issue of material fact exists under the reasonable expectations doctrine.

### III. Standard of Review.

We use the errors at law standard when our decision rests upon the interpretation of an insurance policy. *Jones v. State Farm Mut. Auto. Ins. Co.*, 760 N.W.2d 186, 188 (Iowa 2008). Additionally, we review a district court's grant of summary judgment for correction of errors at law.[1] Iowa R. App. P. 6.907; *Nationwide Mut. Ins. Co. v. Kelly*, 687 N.W.2d 272, 274 (Iowa 2004). The district court properly grants summary judgment when the moving party demonstrates there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. Iowa R. Civ. P. 1.981(3); *Kelly*, 687 N.W.2d at 274. We can resolve a matter on summary judgment if the record reveals a conflict concerning only the legal consequences of undisputed facts. *Pecenka v. Fareway Stores, Inc.*, 672 N.W.2d 800, 802 (Iowa 2003).

When reviewing the district court decision, we examine the record in the light most favorable to the nonmoving party. *Minor v. State*, 819 N.W.2d 383, 393 (Iowa 2012). We afford the nonmoving party " 'every legitimate inference that can be reasonably deduced from the evidence, and if reasonable minds can differ on how the issue should be resolved, a fact question is generated,' " and the district court should deny summary judgment. *Bank of the W. v. Kline*, 782 N.W.2d 453, 456–57 (Iowa 2010)

---

[1]Grinnell Mutual sought declaratory judgment, which would normally indicate that our standard of review depends upon whether the parties brought the case in equity or at law in the district court. *Ferguson v. Allied Mut. Ins. Co.*, 512 N.W.2d 296, 297 (Iowa 1994). However, "[t]hat distinction is inconsequential on this appeal because the matter is before us on review of the district court's entry of summary judgment" in favor of the Boelmans. *Id.* Thus, we base our review on the propriety of the district court's summary judgment ruling, not the declaratory judgment. *Id.*

(quoting *Hills Bank & Trust Co. v. Converse*, 772 N.W.2d 764, 771 (Iowa 2009)).

**IV. Legal Standards for Interpreting and Construing an Insurance Policy.**

Before scrutinizing the Farm-Guard policy, we must observe the differences between interpretation and construction of an insurance policy. Interpretation requires us to give meaning to contractual words in the policy. *Connie's Constr. Co. v. Fireman's Fund Ins. Co.*, 227 N.W.2d 207, 210 (Iowa 1975). Policy interpretation is always an issue for the court, unless we are required to rely upon extrinsic evidence or choose between reasonable inferences from extrinsic evidence. *Id.* If the policy does not define a term, we give the word its ordinary meaning. *Interstate Power Co. v. Ins. Co. of N. Am.*, 603 N.W.2d 751, 754 (Iowa 1999). The plain meaning of the insurance contract generally prevails. *Thomas v. Progressive Cas. Ins. Co.*, 749 N.W.2d 678, 682 (Iowa 2008).

Construction is the process of giving legal effect to a contract. *Id.* at 681. This is always a matter of law for the court. *Id.* The cardinal rule of construing insurance policies is that except in cases of ambiguity, the intent of the parties must control, and the court determines the intent of the parties by looking at what the policy itself says. *Id.* We consider the parties' intent at the time the policy was sold, not in hindsight. *Ferguson v. Allied Mut. Ins. Co.*, 512 N.W.2d 296, 299 (Iowa 1994). We will not strain the words or phrases of the policy in order to find liability that the policy did not intend and the insured did not purchase. *Thomas*, 749 N.W.2d at 682.

Under an objective test, a policy is ambiguous if the language is susceptible to two *reasonable* interpretations. *Id.* at 681. We read the policy as a whole when determining whether the contract has two equally

plausible interpretations, not seriatim by clauses. *Id.* at 681–82. This stems from the concept that " '[w]ords in an insurance policy are to be applied to subjects that seem most properly related by context and applicability.' " *Jones*, 760 N.W.2d at 188 (quoting *Talen v. Emp'rs Mut. Cas. Co.*, 703 N.W.2d 395, 402 (Iowa 2005)). Accordingly, reading the contract as a whole requires us to consider all declarations, riders, or endorsements attached. *Ferguson*, 512 N.W.2d at 299; *see also* 2 Steven Plitt, Daniel Maldonado & Joshua D. Rogers, *Couch on Insurance 3d* § 21:21, at 21-88 to 21-91 (rev. ed. 2010) [hereafter *Couch on Insurance 3d*].

The terms in the endorsement govern if the terms in the body of the policy conflict with the endorsement. *Bobich v. Oja*, 104 N.W.2d 19, 24 (Minn. 1960); *Couch on Insurance 3d* § 21:22, at 21-101 to 21-102 (emphasizing the terms of the endorsement control over the original policy). We will not interpret an insurance policy to render any part superfluous, unless doing so is reasonable and necessary to preserve the structure and format of the provision. *Thomas*, 749 N.W.2d at 685. Moreover, we interpret the policy language from a reasonable rather than a hypertechnical viewpoint. *Steel Prods. Co. v. Millers Nat'l Ins. Co.*, 209 N.W.2d 32, 36 (Iowa 1973).

If the policy is ambiguous, we adopt the construction most favorable to the insured. *Hamm v. Allied Mut. Ins. Co.*, 612 N.W.2d 775, 778 (Iowa 2000). This same rule applies when an exclusion is ambiguous, because " '[a]n insurer assumes a duty to define any limitations or exclusionary clauses in clear and explicit terms.' " *Thomas*, 749 N.W.2d at 682 (quoting *Hornick v. Owners Ins. Co.*, 511 N.W.2d 370, 374 (Iowa 1993)). Thus, we strictly construe exclusions against the insurer. *Ferguson,* 512 N.W.2d at 299. We do so because

insurance policies constitute adhesion contracts. *Allied Mut. Ins. Co. v. Costello*, 557 N.W.2d 284, 286 (Iowa 1996).

An insurance policy is not ambiguous, however, just because the parties disagree as to the meaning of its terms. *Essex Ins. Co. v. Fieldhouse, Inc.*, 506 N.W.2d 772, 776 (Iowa 1993). If an insurance policy and its exclusions are clear, the court "will not 'write a new contract of insurance'" for the parties. *Thomas*, 749 N.W.2d at 682 (quoting *Cairns v. Grinnell Mut. Reins. Co.*, 398 N.W.2d 821, 824 (Iowa 1987)).

**V. Analysis.**

The Boelmans assert the Custom Feeding Endorsement is ambiguous and urge the court to construe this ambiguity in their favor. The court of appeals agreed the Farm-Guard policy, containing the endorsement, was ambiguous. Grinnell Mutual contends the policy is not ambiguous because the endorsement explicitly removes only Exclusion 6(a), the general exclusion for custom farming, and clearly communicates it does not alter or supersede any other exclusions. As a result, Grinnell Mutual points out that the care, custody, or control exclusions still apply and refuse to indemnify the Boelmans. To determine the existence of an ambiguity, we look to what the policy says. *Thomas*, 749 N.W.2d at 683.

**A. Coverage Under the Farm-Guard Policy, Without the Custom Feeding Endorsement.** Coverage A, which protects against liability to the public, appears to provide broad coverage for all property damage the Boelmans would be legally obligated to pay. This coverage insures the holder up to $100,000 for each occurrence, with a $200,000 annual aggregate. However, as with most policies, the exclusions narrow the coverage.

Exclusion 5 limits Coverage A by barring recovery for property damage or loss arising when another's property is in the Boelmans' care, custody, or control. This exclusion makes sense in light of Coverage A-1, which *provides* coverage to the insureds for damage arising while other's property is in the Boelmans' care, custody, or control.

Additionally, Exclusion 6(a), which is applicable to all the coverages in the policy, limits Coverage A by excluding recovery for property damage arising out of custom farming, if the insured's total gross receipts from all custom farming exceed $2000 in the twelve months of the prior calendar year. This exclusion operates so that if all income from custom farming operations is $2000 or less, and the damage is to property *not* in the care, custody, or control of the Boelmans, Coverage A would provide protection.

The following shows an example of the property damage protected by Coverage A. If the Boelmans' income from custom farming did not exceed $2000, and if their custom farming operation caused an explosion, damaging a third person's car parked on the Boelmans' property, then the Boelmans would be indemnified by Grinnell Mutual. As this example illustrates, the purpose of Exclusion 6(a) is to limit the insurance company's liability for property *not* in the Boelmans' care, control, or custody to the risks associated with a farmer whose operation includes custom farming grossing $2000 or less per year. This is reasonable, because the custom farming operation's size, as indicated by income, correlates to the risks associated with that operation. The more expansive the custom farming operation is, the greater the risks.

Coverage A-1 protects against damage to other's property while it is in the care, custody, or control of the Boelmans. The limits of liability under this coverage are $1000 for each occurrence. Coverage A-1 also

has exclusions limiting its applicability. Exclusion 2 bars recovery for property damage arising out of custom farming. The custom farming exclusion applies because the Boelmans care for another's livestock under a written or oral agreement. The purpose of this exclusion is to prevent Grinnell Mutual from becoming an insurer of the Boelmans' obligations and performance under their agreement to raise another's livestock. Thus, the purpose of Coverage A-1 is to provide protection if the Boelmans' borrowed another's piece of equipment, the equipment suffers damage on the Boelmans' property, and the damage does not arise from their custom farming.

In summary, Coverage A indemnifies the Boelmans for liability to third parties arising from property damage they are legally obligated to pay. However, it excludes coverage for damage to other's property in the care, custody, or control of the Boelmans. It also excludes coverage for damage to other's property that arises out of custom farming if the gross receipts from the Boelmans' custom farming operation exceed $2000. Thus, the policy will protect against all property damage the Boelmans are legally obligated to pay, as long as the property was not in their care, custody, or control, and the property damage did not arise out of their custom farming operation.[2] Moreover, Coverage A-1 pays for damage to property of others in the care, custody, or control of the Boelmans, regardless of liability, but not when the property damage arises out of custom farming. When we read the policy as a whole, all the coverages and exclusions in the policy are consistent with each other. Therefore,

---

[2]The record establishes that the Boelmans' income from custom farming exceeded $2000. Thus, the general exclusion in the policy, Exclusion 6(a), applies in the absence of the Custom Feeding Endorsement.

we find the policy, as issued without the Custom Feeding Endorsement, is unambiguous.

**B. Coverage Under the Farm-Guard Policy, With the Custom Feeding Endorsement.** The Boelmans contend the Custom Feeding Endorsement makes the policy ambiguous. Thus, the Boelmans urge us to construe the policy in their favor and provide coverage in accordance with the court of appeals. We disagree and refuse to do so.

The Custom Feeding Endorsement provides in bold type that the insured must read the endorsement carefully, because it *modifies* the Farm-Guard policy. The endorsement specifically refers to Exclusion 6(a) contained in the policy's general exclusion section. The endorsement merely raises the threshold from $2000 in custom farming income to $150,000 before Exclusion 6(a) bars indemnity by the insured. Thus, the endorsement operates to broaden the protection afforded under Coverage A, pertaining to liability to the public, in the Farm-Guard policy. Accordingly, if the Boelmans are liable for damage to property not in their care, control, or custody, and their custom farming operation grosses $150,000 or less per year, the policy will indemnify the Boelmans. Accordingly, we do not see how this endorsement conflicts with any other policy provision.

Our conclusion in this regard is consistent with existing law. Courts recognize that endorsements do not alter or supersede care, custody, or control exclusions. *See, e.g.*, *Kemper Nat'l Ins. Cos. v. Heaven Hill Distilleries, Inc.*, 82 S.W.3d 869, 875 (Ky. 2002) (finding a commercial general liability policy with an endorsement removing a pollution damage exclusion did not supersede the care, custody, or control exclusion). More specifically, courts have found that custom feeding endorsements do not preempt care, custody, or control provisions

contained in the basic policy. *See Grinnell Mut. Reins. Co. v. Schwieger*, 685 F.3d 697, 701 (8th Cir. 2012) (construing the exact same Farm-Guard policy and Custom Feeding Endorsement). We have specifically rejected the argument that "having property in your care is the 'essence of a custom livestock feeding operation'" and refused to find an endorsement conflicts with a policy including a care, custody, or control exclusion. *Ferguson*, 512 N.W.2d at 299–300.

The care, custody, or control exclusion functions specifically to prevent the insurance company from becoming a guarantor of the insured's work. *Connie's Const. Co.*, 227 N.W.2d at 211. It does not apply "when the property damaged is merely incidental to the property upon which the work is being performed by the insured at the time of the accident." *Id.* However, we recognize the exclusion "*is applicable* if the property damaged is under the supervision of the insured and is a necessary element of the work being performed." *Id.* (emphasis added). The "Sew Nursery Agreement" indicates the Boelmans were directly managing the hogs and that doing so was a necessary element of their task of feeding the hogs to market weight. A second requirement for the exclusion to apply is that the insured be in exclusive control of the damaged property. *Id.* Here, it is undisputed that the Boelmans were in exclusive care, custody, or control of the hogs that died.

We would be engaging in a strained analysis and would be stretching the endorsement's terms beyond the bounds of reasonability to find the endorsement functions to negate *all* exclusions whole cloth in the Farm-Guard policy. *Thomas*, 749 N.W.2d at 682. The court of appeals erred by indulging in this practice.

Any such construction contorts the endorsement to read, "In consideration of the premium charged, none of the policy's exclusions

apply." Agreeing with this logic would be to ignore completely the numerous other exclusions in the policy, which the endorsement expressly leaves intact. *See Ferguson*, 512 N.W.2d at 300 (observing a construction is unreasonable if it requires us to completely ignore policy exclusions). Here, the endorsement does not *expressly* remove any other exclusions from the policy, such as the care, custody, or control provisions. Instead, the endorsement clearly indicates that "[a]ll other terms and provisions of the policy apply," including exclusions. Moreover, such construction would denigrate our established principle that " '[e]ndorsements do not limit or change the basic policy except as *specifically* set out in the endorsement.' " *Id.* (emphasis added) (quoting *Swift & Co. v. Zurich Ins. Co.*, 511 S.W.2d 826, 832 (Mo. 1974)). Construing the policy in this manner would also result in rejecting jurisprudence that has recently developed on this very issue. *See Schwieger*, 685 F.3d at 699, 703 (construing the exact same Farm-Guard policy and Custom Feeding Endorsement).

Additionally, to adopt the Boelmans' interpretations would be to write a new contract for the parties. *Thomas*, 749 N.W.2d at 682. There is no indication in the record that the parties intended the endorsement to have the sweeping effect of removing other policy exclusions. The fact that Grinnell Mutual only charged $27 annually in premiums for the added protection under the endorsement does not correlate with the substantially elevated risk they would have assumed if they had removed all exclusions touching upon the Boelmans' custom farming operation.

Moreover, the endorsement only vests the right to recovery in a third party, not the holder of the property, such as a contract feeder. The recognition of an increased risk of property damage and subsequent liability inures to the third party.

The endorsement required Grinnell Mutual to compensate the Boelmans for losses if their total gross receipts from custom farming were not more than $150,000. This was a significant increase in protection from the basic policy, which only required Grinnell Mutual to pay out for custom farming losses if the insured farmer's total gross receipts were less than $2000 for the previous year. Thus, the basic policy only protected hobby farmers, not large-scale producers, for losses to third parties from custom farming operations.

Therefore, we find the policy with the Custom Feeding Endorsement is not ambiguous. Thus, the policy with the endorsement does not provide coverage for this loss.

**VI. Reasonable Expectations Doctrine.**

In their brief to the district court, the Boelmans raised the reasonable expectations doctrine as an alternative ground for relief. The district court construed the policy in favor of the Boelmans based upon their reasonable expectation of coverage in the event of loss arising from their custom farming operations. When a party raises an alternative ground for a motion for summary judgment in the district court, we can consider that ground on appeal. *Bagelmann v. First Nat'l Bank*, 823 N.W.2d 18, 32 (Iowa 2012).

The reasonable expectations doctrine "is a recognition that insurance policies are sold on the basis of the coverage they promise." *Clark-Peterson Co. v. Indep. Ins. Assocs., Ltd.*, 492 N.W.2d 675, 679 (Iowa 1992). It does not expand coverage on a purely equitable basis. *Id.* at 677. Thus, as a preliminary matter, it was improper for the district court to find the Boelmans reasonably expected coverage.

Instead, the doctrine is carefully circumscribed. *Id.* This is because "[i]nsurance coverage is a contractual matter and is ultimately

based on policy provisions." *Jones*, 760 N.W.2d at 188 (citation and internal quotation marks omitted). Accordingly, we allow insurers to limit coverage to only specific claims. *Id.*

The doctrine is only invoked when an exclusion "(1) is bizarre or oppressive, (2) eviscerates terms explicitly agreed to, or (3) eliminates the dominant purpose of the transaction." *Clark-Peterson Co.*, 492 N.W.2d at 677 (citation and internal quotation marks omitted). If the doctrine applies, "the objectively reasonable expectations of applicants and intended beneficiaries regarding insurance [policies] will be honored even though painstaking study of the policy provisions would have negated those expectations." *Id.* (citation and internal quotation marks omitted). Evidence of reasonable expectations comes from the underlying negotiations or the inferences arising from the circumstances of when the parties entered the policy. *Id.* Only representations made by the insurer at the time of policy negotiation and issuance are relevant. *Vos v. Farm Bureau Life Ins. Co.*, 667 N.W.2d 36, 50 (Iowa 2003).

For the doctrine to apply, a prerequisite must first be satisfied. "*[T]he insured* must prove circumstances attributable to the insurer that fostered coverage expectations or show that the policy is such that an ordinary layperson would misunderstand its coverage." *Nationwide Agri-Bus. Ins. Co. v. Goodwin*, 782 N.W.2d 465, 473 (Iowa 2010) (emphasis added) (citations and internal quotation marks omitted). The Boelmans must carry this burden.

The Boelmans fail to do so. At the district court, they did not conduct the discovery needed to make a reasonable expectations argument. For instance, the record lacks any indication the Boelmans expected the endorsement's dominant purpose was to provide coverage for the hogs in their care, custody, or control. Additionally, nothing

shows the content of the negotiations between the Boelmans and agents or representatives of Grinnell Mutual when they executed the policy. The Boelmans did not file an affidavit covering any of these subjects. Thus, the Boelmans have presented no evidence of (1) representations made by Grinnell Mutual, which might have fostered expectations, or (2) reliance by the Boelmans on any such representations. Thus, there is no genuine issue of material fact concerning the application of the doctrine.

Additionally, the doctrine of reasonable expectations does not apply because the policy does not contain ambiguous language or constitute the "extreme situation" of a policy containing a "hidden exclusion." *Schwieger*, 685 F.3d at 702 (citation and internal quotation marks omitted). The Boelmans could not have reasonably expected coverage for *any loss* arising from their custom farming operation, based upon the explicit language of the endorsement and exclusions in the policy. Despite the endorsement, the policy still expressly excludes coverage through two separate care, custody, or control exclusions. Thus, based on the plain language of the policy, the Boelmans could not reasonably expect coverage under these circumstances. Moreover, they failed to guard against such losses as suffocation, even though the "Sew Nursery Agreement" imposed upon them a duty to obtain insurance in the case of suffocation. Accordingly, we find no genuine issue of material fact exists concerning the reasonable expectations doctrine and find the doctrine is inapplicable.

### VII. Disposition.

On further review, we find the policy is not ambiguous and does not provide coverage as a matter of law. Additionally, we find there is no genuine issue of material fact as to the application of the reasonable expectations doctrine and conclude, as a matter of law, that it does not

apply. Therefore, we vacate the decision of the court of appeals, reverse the judgment of the district court, and remand the case to the district court with instructions to enter judgment in favor of Grinnell Mutual on its motion for summary judgment.

**COURT OF APPEALS DECISION VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED WITH INSTRUCTIONS.**