# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1774

_____

Scottsdale Insurance Company,     *
                                     *

              Appellee,     *

                                     *    Appeal from the United States

      v.                               *    District Court for the

                                     *    District of Minnesota.

Universal Crop Protection Alliance,     *
LLC,                                    *

                                     *

             Appellant.     *

_____

Submitted: March 10, 2010
Filed: September 8, 2010

_____

Before RILEY, Chief Judge,[1] JOHN R. GIBSON and MURPHY, Circuit Judges.

_____

RILEY, Chief Judge.

Scottsdale Insurance Company (Scottsdale) issued a general commercial liability insurance policy for the benefit of Universal Crop Protection Alliance, LLC (UCPA). The policy contained a pollution exclusion. In 2007, scores of Arkansas farmers sued UCPA, alleging one of UCPA's herbicides destroyed their cotton crops. Scottsdale then brought the instant declaratory judgment action against UCPA, seeking a ruling that the pollution exclusion relieved Scottsdale of any obligation to

_____

[1]The Honorable William Jay Riley became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 1, 2010.

defend or indemnify UCPA. Scottsdale moved for summary judgment, which the district court[2] granted. UCPA appeals, arguing the district court lacked jurisdiction and construed the pollution exclusion too broadly. We affirm.

## I.    BACKGROUND

UCPA, a wholly owned subsidiary of Universal Cooperatives, Inc. (Universal), is a farm-supply cooperative that manufactures and sells chemicals. UCPA is a Minnesota limited liability company with its principal place of business in Minnesota. Scottsdale, a wholly owned subsidiary of Nationwide Mutual Insurance Company, is an excess and surplus lines insurance company. Scottsdale is an Ohio corporation with its principal place of business in Arizona.

### A.    Policy

In 2006, Universal purchased a commercial general liability insurance policy (Policy) from Scottsdale for $190,000. The Policy, effective from May 1, 2006 to May 1, 2007, listed UCPA as a named insured. In relevant part, the Policy provided the following coverage:

> **1. Insuring Agreement**
>    **a.** [Scottsdale] will pay those sums that [UCPA] becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies. [Scottsdale] will have the right and duty to defend [UCPA] against any "suit" seeking those damages. However, [Scottsdale] will have no duty to defend [UCPA] against any "suit" . . . to which this insurance does not apply.
>
>        . . . .

___

[2]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

**b.** This insurance applies to . . . "property damage" only if:

(1) The . . . "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; [and]

(2) The . . . "property damage" occurs during the policy period

. . . .

The Policy defined "property damage" as including "[p]hysical injury to tangible property."

The Policy contained a pollution exclusion, disclaiming coverage for "'property damage' which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants.'" The Policy defined "pollutants" as including "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."

The Policy provided UCPA with $1 million in coverage for each "occurrence" of property damage, defining "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Coverage was subject to a $500,000 deductible for each occurrence. The costs of defending UCPA from a lawsuit were subject to the $500,000 deductible, but not the $1 million coverage limit.

## B. Arkansas Lawsuit

On May 31, 2007, more than 80 cotton farmers sued UCPA and four other herbicide manufacturers in the United States District Court for the Eastern District of Arkansas (Arkansas Lawsuit). The cotton farmers alleged that, in June and July 2006, neighboring rice farmers applied tens of thousands of pounds of the manufacturers' herbicides to control weeds in their rice fields. The farmers claimed the herbicides contained dichlorophenoxyacetic acid (2,4-D), a phytotoxin, or plant poison, that is

extremely toxic to cotton plants. The cotton farmers alleged the 2,4-D drifted off-target and damaged fields in five Arkansas counties.

On June 4, 2007, the cotton farmers served UCPA with their complaint, which asserted state law claims of strict products liability; deceptive trade practices; negligent design, testing, and warning; breach of implied warranty of fitness for a particular purpose; and implied warranty of merchantability. Invoking diversity jurisdiction under 28 U.S.C. § 1332, the cotton farmers sought compensatory and punitive damages, attorney fees, and costs from the herbicide manufacturers.

On June 12, 2007, UCPA tendered the Arkansas Lawsuit to Scottsdale for defense and indemnification. On July 27, 2007, Scottsdale agreed to defend UCPA subject to a complete reservation of its rights under the Policy. Scottsdale reminded UCPA of the Policy's $500,000 deductible and declined to provide UCPA a "first-dollar" defense.

### C. Declaratory Judgment Action

On July 26, 2007, the day before Scottsdale provisionally agreed to defend UCPA, Scottsdale filed this declaratory judgment action against UCPA in the United States District Court for the District of Minnesota (district court), pursuant to 28 U.S.C. §§ 2201-2202 and Fed. R. Civ. P. 57. Scottsdale invoked the district court's diversity jurisdiction under 28 U.S.C. § 1332, alleging the parties were citizens of different states and the amount in controversy exceeded $75,000, exclusive of interest and costs. Among other things, Scottsdale asked the district court for declarations that "Scottsdale has no duty to defend or indemnify" UCPA and, in any event, "a $500,000 property damage deductible applies."

In its answer, UCPA denied the amount in controversy exceeded $75,000, exclusive of interest and costs, pointing out the attorney fees and costs expended in the Arkansas Lawsuit "did not exceed $75,000 as of the date this action was

-4-

commenced, and [the cotton farmers] have not alleged that they are seeking damages from UCPA in excess of the $500,000 deductible." In its counterclaim, UCPA sought a declaration that UCPA had the right to select its own defense counsel, in part because "[t]here are numerous conflicts of interest [between] Scottsdale and UCPA, including . . . the $500,000 deductible." UCPA also alleged breach of contract, asserting Scottsdale violated the Policy by failing to pay the attorney fees and costs UCPA had expended on the Arkansas Lawsuit.

Scottsdale moved for summary judgment, and UCPA moved to dismiss. Scottsdale asked the district court for a declaration that the pollution exclusion relieved Scottsdale of any obligation under the Policy to defend and indemnify UCPA in the Arkansas Lawsuit. UCPA asserted the district court lacked subject matter jurisdiction because the requisite amount in controversy was lacking and the parties' dispute was not ripe for adjudication.

In its resistance to Scottsdale's motion for summary judgment, UCPA argued the district court should equitably estop Scottsdale from enforcing the pollution exclusion because (1) Scottsdale conspired with UCPA's broker to raise the Policy's premium, and (2) the pollution exclusion rendered the Policy's coverage illusory. In the alternative, UCPA asked the district court to refrain from issuing total summary judgment in Scottsdale's favor because, on December 29, 2008, the cotton farmers filed an amended complaint to offer a second theory as to how the herbicide manufacturers' 2,4-D damaged their cotton plants. In addition to their original "off-target drift" theory, UCPA now alleged some 2,4-D had landed on target but had later "relofted" and drifted onto the cotton fields. UCPA speculated any damages from "relofting" might have resulted, not from any toxic effect of 2,4-D, but from non-toxic relofted particle essences inhibiting photosynthesis by blocking sunlight (as with dust). Under the relofting theory then, UCPA posits, 2,4-D might not qualify as a "pollutant" under the Policy. The amended complaint also added an additional herbicide manufacturer as a defendant.

On March 3, 2009, the district court issued an order expressing three primary holdings. First, the district court held the amount in controversy exceeded $75,000, exclusive of interest and costs. The district court found UCPA's argument to the contrary in its motion to dismiss was "not well taken" because, "[a]s UCPA is well aware, there is much more than $75,000 at stake in the underlying litigation."

Second, the district court held "[t]here is no doubt that Scottsdale's duty to defend can be resolved without any further record development, and therefore the case is ripe." In a footnote, however, the district court stated: "Scottsdale contends that both its duty to defend and the duty to indemnify can be resolved in a declaratory judgment at this time. However, whether Scottsdale has the duty to indemnify may depend on the theory of liability that is successful against UCPA in the underlying litigation."

Third, the district court held Scottsdale did not have a duty to defend UCPA. The district court determined (1) any alleged conspiracy between Scottsdale and the broker to raise UCPA's premium would not invalidate the pollution exclusion; (2) the pollution exclusion did not render the Policy's coverage illusory; and (3) the relofting theory fell within the pollution exclusion.

Notwithstanding the district court's footnote appearing to indicate at least a portion of Scottsdale's complaint was not ripe, the district court observed "[t]he [pollution] exclusion applies to bar coverage in the underlying case," granted Scottsdale's motion for summary judgment in its entirety, and denied UCPA's motion to dismiss in its entirety. Without referencing Scottsdale's complaint or UCPA's counterclaims, the clerk of court entered the following formal judgment: "Defendant's Motion to Dismiss . . . is DENIED" and "Plaintiff's Motion for Summary Judgment is . . . GRANTED." UCPA appeals.

-6-

## III.    DISCUSSION

### A.    Standard of Review

We review the district court's legal determinations de novo. See, e.g., Advance Am. Servicing of Ark., Inc. v. McGinnis, 526 F.3d 1170, 1173 (8th Cir. 2008) (amount in controversy); Vogel v. Foth & Van Dyke Assocs., Inc., 266 F.3d 838, 840 (8th Cir. 2001) (ripeness); Gregoire v. Class, 236 F.3d 413, 416 (8th Cir. 2000) (summary judgment). We review the district court's factual findings for clear error. See Usery v. Anadarko Petro. Corp., 606 F.3d 1017, 1019 (8th Cir. June 7, 2010) (reviewing the district court's factual findings made in conjunction with its amount-in-controversy ruling for clear error).

### B.    Amount in Controversy

UCPA criticizes the district court's determination that the amount in controversy exceeded $75,000, exclusive of interest and costs, as "conclusory," and "a complete mystery because [the order] contains no supporting facts or analysis." UCPA maintains Scottsdale must prove the amount in controversy actually exceeded $575,000, exclusive of interest and costs—§ 1332's jurisdictional minimum plus the Policy's $500,000 deductible. In support of its argument that the amount in controversy does not exceed this threshold, UCPA points out (1) UCPA had only incurred $33,021 in defense costs when Scottsdale brought suit; (2) the complaint in the Arkansas Lawsuit does not specifically allege an amount in controversy between each plaintiff and UCPA, so "there is no evidence regarding UCPA's potential liability"; and (3) in late September 2007, the district court in the Arkansas Lawsuit determined the six herbicide manufacturer defendants are not jointly and severally liable.

"When the two parties to an action are citizens of different states, as they are here, a federal district court's jurisdiction extends to 'all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.'" Kopp v. Kopp, 280 F.3d 883, 884 (8th Cir. 2002) (quoting 28 U.S.C. § 1332(a)).

"'[A] complaint that alleges the jurisdictional amount in good faith will suffice to confer jurisdiction, but the complaint will be dismissed if it "appear[s] to a legal certainty that the claim is really for less than the jurisdictional amount."'" Id. (quoting Larkin v. Brown, 41 F.3d 387, 388 (8th Cir. 1994) (quoting in turn St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 289 (1938))). "'If the defendant challenges the plaintiff's allegations of the amount in controversy, then the plaintiff must establish jurisdiction by a preponderance of the evidence.'" Kopp, 280 F.3d at 884-85 (quoting McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 188-89 (1936)).

> When the "legal certainty" standard announced in Larkin is combined with the burden of proof established in McNutt, it appears that the relevant legal rule is that the proponent of diversity jurisdiction must prove a negative by a preponderance of the evidence in order to avoid dismissal of his or her case. A leading treatise, for example, suggests that the proponent of federal jurisdiction must show "that it does not appear to a legal certainty that the claim for relief is for less than the statutorily prescribed jurisdictional amount." 14B Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, Federal Practice and Procedure § 3702 (3d ed. 1998).

Id. at 885.

It is well established that the requirements for diversity jurisdiction must be satisfied only with respect to the time of filing. See Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567, 570-71 (2004). Subsequent events reducing the amount in controversy do not destroy diversity jurisdiction. Rosado v. Wyman, 397 U.S. 397, 405 n.6 (1970). Subsequent events may, however, be relevant to prove the existence or nonexistence of diversity jurisdiction at the time of filing. See, e.g., Grinnell Mut. Reins. Co. v. Shierk, 121 F.3d 1114, 1116 (7th Cir. 1997) (observing that, only six months after a declaratory judgment action was filed by an insurer against an insured, the plaintiff in the underlying liability action argued to a jury that a $100,000 award was appropriate against the insured).

Applying the foregoing legal standards, we hold the district court did not clearly err in finding the amount in controversy exceeded $75,000, exclusive of interest and costs, when Scottsdale filed the instant declaratory judgment action against UCPA. See 28 U.S.C. § 1332. We agree Scottsdale alleged the jurisdictional minimum in good faith. Therefore, Scottsdale only needed to prove, by a preponderance of the evidence, that it did not appear to a legal certainty that the amount in controversy was less than what it alleged. See Kopp, 280 F.3d at 885.

In a declaratory judgment action such as this one, wherein an insurer sues an insured to determine its obligation to defend and indemnify, the amount in controversy in the declaratory judgment action ordinarily equals the probable costs of defense and indemnification of the underlying litigation less any applicable deductible. See, e.g., Capitol Indem. Corp. v. Miles, 978 F.2d 437, 438 (8th Cir. 1992).[3] While the Policy's deductible is relatively high—$500,000—the probable costs of defense and indemnification of the Arkansas Lawsuit nonetheless exceeded $575,000, exclusive of interest and costs, when Scottsdale filed the instant declaratory judgment action. Under the terms of the Policy, Scottsdale was potentially liable for $1 million dollars in property damage plus the cost of defending UCPA from the cotton farmers. See Budget Rent-A-Car v. Higashiguchi, 109 F.3d 1471, 1473 (9th Cir. 2007) (holding policy limits are relevant to determining the amount in controversy when the validity of the entire policy is at issue or the value of the

---

[3]In cases where the deductible itself is a subject of dispute, we do not subtract the deductible. See Capitol Indem. Corp., 978 F.2d at 438. Although UCPA no longer asserts it is entitled to a first-dollar defense under the Policy, it appears, when Scottsdale filed the instant declaratory judgment action, the applicability of the deductible to the Arkansas Lawsuit was in dispute. In its answer and counterclaim, UCPA implicitly asserted the right to a "first dollar" defense, and explicitly confirmed such position in its answers to Scottsdale's interrogatories. For present purposes, we assume without deciding that, at the time Scottsdale filed this action, it appeared to a legal certainty that UCPA did not dispute the deductible's applicability.

underlying tort claim exceeds the limits).[4] At the time of filing, Scottsdale and UCPA did not know the Arkansas district court would not hold the herbicide manufacturers jointly and severally liable. The alleged breadth of the Arkansas Lawsuit was staggering, and it seemed likely the cotton farmers would pursue damages in excess of the Policy's property damage limits.

The cotton farmers' allegations in their governing complaint corroborate this commonsense assumption. Each of the cotton farmers invoked diversity jurisdiction under 28 U.S.C. § 1332, thereby implicitly alleging each claim exceeded $75,000, exclusive of interest or costs. See Allison v. Sec. Benefit Life Ins. Co., 980 F.2d 1213, 1215 (8th Cir. 1992) ("It is well settled that each plaintiff, even in a class action, must individually satisfy the . . . jurisdictional amount requirement."); cf. Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 566-67 (2005) (holding 28 U.S.C. § 1367 permits exercise of jurisdiction over additional plaintiffs who fail to satisfy the minimum amount-in-controversy requirement, as long as other elements of diversity jurisdiction are present and at least one named plaintiff satisfies the amount-in-controversy requirement).

Less than one month after Scottsdale filed this declaratory judgment action, UCPA asserted the Arkansas Lawsuit would require two-phase discovery, two years of pretrial litigation, depositions by each defendant of each plaintiff, and a six-to-eight week trial; the following year, UCPA indicated discovery alone would cost "millions of dollars" and "would be a massive undertaking, involving 86 Plaintiffs, 6 Defendants, 70 [herbicide] applicators, over 1,200 applications [of 2,4-D,] and 1,054 claim fields." See generally Grinnell Mut. Reins., 121 F.3d at 1116 (stating

---

[4]We do not equate the Policy's coverage limits with the amount in controversy because this is not a case in which the jurisdictional minimum is greater than the coverage limits. Cf. Rasmussen v. State Farm Mut. Auto. Ins. Co., 410 F.3d 1029, 1031 (8th Cir. 2005).

post-filing actions may be relevant to determine the amount in controversy at the time of filing).[5]

### C.    Ripeness

As indicated, it is unclear whether the district court held (1) Scottsdale's entire complaint was ripe (as the district court's directions to the clerk of court, the terms of the clerk of court's formal judgment, and the district court's remark that "the case is ripe" suggest) or (2) only such portion of the complaint seeking a declaration that Scottsdale did not owe a duty to defend UCPA was ripe (as the district court's footnote and its subsequent failure to analyze Scottsdale's alleged duty to indemnify might indicate).  Not surprisingly, UCPA and Scottsdale express different views as to the meaning and effect of the district court's order.

UCPA contends the district court held Scottsdale's complaint was not ripe with respect to its request for a declaration that Scottsdale owed no duty to indemnify UCPA in the Arkansas Lawsuit.  UCPA points out Scottsdale did not cross-appeal and concludes the district court's holding of unripeness is now the law of the case.

Scottsdale maintains the district court held its entire complaint was ripe. Scottsdale reasons any confusion engendered by the district court's failure to explicitly discuss Scottsdale's alleged duty to indemnify disappears when one bears in mind "[i]t is axiomatic that the duty to defend is broader than the duty to indemnify." Wooddale Builders, Inc. v. Md. Cas. Co., 722 N.W.2d 283, 302 (Minn. 2006).  In other words, the district court's holding that Scottsdale owed no duty to defend UCPA from the cotton farmers obviated any need to discuss Scottsdale's purported duty to indemnify UCPA from the cotton farmers.

---

[5]UCPA made the latter representations to the Arkansas district court in conjunction with an unsuccessful attempt to limit the scope of discovery.

We believe the terms of the district court's formal judgment are the best evidence of its decision under the unusual circumstances of this case. Cf. United States v. West, 549 F.2d 545, 556 & n.8 (8th Cir. 1977) (following the formal terms of the judgment when there was a conflict between the formal terms of the judgment and an apparent oversight in a pre-judgment proceeding). We construe the district court's order to hold that the entirety of Scottsdale's complaint was ripe for adjudication. This reading is consistent with black-letter Minnesota law declaring the duty to defend is broader than the duty to indemnify, Wooddale, 722 N.W.2d at 302, as well as the district court's sweeping observations that "the case is ripe" and "[t]he [pollution] exclusion applies to bar coverage in the underlying case."

With respect to the merits of the ripeness issue, UCPA argues the district court erred in holding the declaratory judgment action was ripe when filed. UCPA stresses the Arkansas Lawsuit is ongoing and avers "facts [in the Arkansas Lawsuit] are still developing regarding" the cotton farmers' relofting theory. UCPA opines it is unclear whether the cotton farmers are alleging the relofted 2,4-D particulates were toxic and thus "pollutants" under the Policy. UCPA insists Scottsdale would not suffer any harm were the instant litigation delayed.

The parties' dispute was and remains unquestionably ripe for adjudication. In the insurance policy coverage context, a declaratory judgment action is ripe irrespective of whether the underlying litigation is ongoing or resolved. In Capitol Indem. Corp., 978 F.2d at 438, we observed:

> [The insured] argues that the present controversy is not ripe for adjudication because the [underlying] suit is not yet resolved. This contention lacks merit. [The insured] has made a demand on [the insurer,] and [the insurer] has contended that there are no circumstances under which it can owe [the insured] any money. The lines are drawn, the parties are at odds, the dispute is real. [The insurer] is in no different position, in any relevant respect, from that occupied by insurers who

-12-

deny that coverage exists under their policy for liabilities of their insureds that are contingent or unadjudicated. In those kinds of situations, it is most common for the insurer to bring an action for a declaratory judgment that it will have no duty to indemnify.

It is irrelevant that factual determinations regarding the cotton farmers' relofting theory are unresolved in the Arkansas Lawsuit. See Aetna Cas. & Sur. Co. v. Gen. Dynamics Corp., 968 F.2d 707, 711 (8th Cir. 1992) (finding dispute between insurer and insured ripe, although the underlying suits were not yet filed or resolved); Capitol Indem. Corp., 978 F.2d at 438; U.S. Fidelity & Guar. Co. v. Pierson, 97 F.2d 560, 562 (8th Cir. 1938); Fed. Ins. Co. v. Sammons Fin. Group, Inc., 595 F. Supp. 2d 962, 972-74 (S.D. Iowa 2009) (discussing Aetna Cas. and Capitol Indem. and concluding an unresolved factual determination does not preclude ripeness).

In any event, we believe the cotton farmers' complaint belies UCPA's concerns about a possible "non-pollutant" relofting theory. The cotton farmers' governing complaint makes clear the relofted particulates are toxic and, therefore, would qualify as "pollutants" under the Policy. For example, the cotton farmers allege, "subsequent to the applications, a portion of the 2,4-D that initially landed on-target and elsewhere, once dried out of solution and relofted into particulate form into the air and [was] transported downwind to Plaintiffs' cotton fields." The cotton farmers allege "cotton fields were exposed to significant amounts of each of Defendants['] 2,4-D products through the mechanism of Relofting," which caused damage by "contribut[ing] to [the] phytotoxic reservoir" of the farmers' cotton plants.[6]

---

[6]We express no view as to whether UCPA may bring a subsequent lawsuit if the cotton farmers materially alter their complaint. See, e.g., St. Paul Fire & Marine Ins. Co. v. Compaq Computer Corp., 457 F.3d 766, 770 (8th Cir. 2006) (indicating res judicata does not bar a subsequent declaratory judgment action if the amended complaint "change[s] the nature of the cause of action alleged or assert[s] a new or different cause of action").

-13-

## D. Pollution Exclusion

UCPA appears to concede, at least insofar as the cotton farmers allege damage to their crops under the off target drift theory of migration, the Policy's pollution exclusion relieves Scottsdale of any obligation to defend and indemnify UCPA. However, UCPA maintains Scottsdale is obligated to defend and indemnify UCPA from the cotton farmers' relofting theory of migration, suggesting again that the relofting theory may be premised upon non-toxic damage to cotton plants. UCPA concludes that, because Scottsdale is obligated to defend UCPA from the relofting theory, Scottsdale is obligated to pay for UCPA's entire defense in the Arkansas Lawsuit.

"Because most insurance policies are preprinted forms drafted solely by insurance companies—basically contracts of adhesion—policy words of inclusion will be broadly construed, and words of exclusion are narrowly considered." Gen. Cas. Co. of Wis. v. Wozniak Travel, Inc., 762 N.W.2d 572, 575 (Minn. 2009). "Unambiguous words will be given their 'plain, ordinary, and popular meaning.'" Id. (quoting Minn. Min. & Mfg. Co. v. Travelers Indem. Co., 457 N.W.2d 175, 179 (Minn. 1990)). The Minnesota Supreme Court has held that any ambiguity in a similarly conspicuous pollution exclusion "should be construed . . . in accordance with the usual rules of interpretation governing insurance contracts"—and not the "reasonable expectation test," which construes ambiguous terms in insurance contracts according to the reasonable expectations of the insured. Bd. of Regents of Univ. of Minn. v. Royal Ins. Co. of Am., 517 N.W.2d 888, 891 (Minn. 1994).

The duty to defend is broader than the duty to indemnify in three respects. Wooddale, 722 N.W.2d at 302. First, "the duty to defend extends to every claim that 'arguably' falls within the scope of coverage." Id. Second, "the duty to defend one claim creates a duty to defend all claims." Id. Third, "the duty to defend exists regardless of the merits of the underlying claims." Id.

-14-

The Policy's pollution exclusion is broad and unambiguously relieves Scottsdale of any obligation to defend or indemnify UCPA from the cotton farmers' claims—under either the off target drift or relofting theories of migration. See Gen. Cas. Co., 762 N.W.2d at 575. Neither theory "arguably" falls outside the scope of the exclusion. See Wooddale, 722 N.W.2d at 302. The Policy plainly excludes coverage for "'property damage' which would not have occurred . . . but for the . . . migration . . . of 'pollutants,'" defining "pollutants" in relevant part as including "any solid, liquid, gaseous or thermal . . . contaminant, including . . . . chemicals." Again, the cotton farmers' relofting theory is concerned only with the migration of a "chemical," i.e., 2,4-D. This is not a case in which the plaintiffs in the underlying litigation have made vague allegations that might permit a construction arguably falling outside of the governing pollution exclusion.

### E.    Motions to Supplement the Record

While this appeal was pending, UCPA filed two motions to supplement the appellate record. UCPA asks us to take judicial notice of recent events in the Arkansas Lawsuit. Because the public records to which UCPA draws our attention would not alter our decision, we deny the motions. See Dak. Indus., Inc. v. Dak. Sportswear, Inc., 988 F.2d 61, 63 (8th Cir. 1993).

## III.    CONCLUSION

We affirm. UCPA's motions to supplement the record are denied.

_____